## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

JENNIFER PASKERT,

          Plaintiff,

vs.

KEMNA-ASA AUTO PLAZA, INC.
et al,

          Defendants.

No.  C17-4009-LTS

**MEMORANDUM OPINION AND
ORDER ON MOTION FOR
SUMMARY JUDGMENT**

---

## I.    INTRODUCTION

This matter is before me on (1) a motion (Doc. No. 39) for summary judgment filed by defendant Brent Burns and (2) a motion (Doc. No. 40) for summary judgment filed by defendants Auto$mart, Inc., Kenneth Kemna (Kenneth), Kemna Motor Company (Kemna Motor) and Brent Weringa.  Plaintiff Jennifer Paskert has filed resistances (Doc. Nos. 55, 57) to both motions and the defendants have filed replies (Doc. Nos. 60, 61, 62).  Oral argument is not necessary.  *See* N.D. Iowa L.R. 7(c).

## II.    PROCEDURAL BACKGROUND

Paskert commenced this action by filing a complaint (Doc. No. 2) on January 31, 2017.  She filed a first amended complaint (Doc. No. 11) on April 13, 2017, and a second amended complaint (Doc. No. 31) on April 26, 2018.  Based on these amendments, Burns, Weringa, Kenneth, Auto$mart, Inc., and Kemna Motor are the five named defendants.

Paskert alleges that she was subjected to a hostile work environment and harassment on the basis of sex by her supervisor, Burns, while she was employed by Auto$mart, Inc., from May to November 2015.  *Id.* at ¶¶ 14-22.  Paskert asserts claims

for hostile work environment discrimination and retaliation in violation of both Title VII of the Civil Rights Act of 1964 and the Iowa Civil Rights Act (ICRA). *Id.* at ¶¶ 23-39. Trial is scheduled to begin February 11, 2019.

## III. *SUMMARY JUDGMENT STANDARDS*

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.* "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or "when 'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine. Put another way, "'[e]vidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis Cnty.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)). The parties "may not merely point to unsupported self-serving allegations." *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008).

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249 (quotations omitted). The party moving for entry of summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. *Id.* If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

To determine whether a genuine issue of material fact exists, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citing *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996)). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick*, 90 F.3d at 1377.

# IV.    RELEVANT FACTS[1]

## A.    The Parties

Plaintiff Jennifer Paskert is a resident of Dickinson County, Iowa, and a female. Doc. No. 31 at ¶ 2. She was employed by Auto$mart, Inc., as a sales associate from May to November 2015. *Id.*

Defendant Auto$mart, Inc., is an Iowa corporation that operates a "buy here, pay here" used car dealership in Spirit Lake, Iowa. Doc. No. 40-2 at 21, 34, 93. Kenneth testified that Auto$mart, Inc., typically has three employees. *Id.* at 44. Auto$mart, Inc., maintains its own financial records and has its own auto dealer's license from the Iowa Department of Transportation. *Id.* at 48.

Defendant Kenneth Kemna splits his time between Florida and Iowa. Doc. No. 40-2 at 95. He is the sole owner of Auto$mart, Inc.,[2] and is also the sole or part owner of several car dealerships and related business entities that are interrelated. *Id.* at 91-94. Kenneth provided this chart in connection with his motion for summary judgment:

---

[1] Many of the "material undisputed facts" proffered by the parties are dependent upon credibility determinations. Obviously, these "undisputed" facts are not subject to a resolution on a motion for summary judgment. *Kammueller*, 383 F.3d at 784 ("[W]e view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses."). Thus, in this section I will endeavor, as necessary, to describe the parties' competing versions of potentially-relevant events.

[2] Technically, Auto$mart, Inc., is owned by trusts controlled by Kenneth and his wife, Victoria Kemna. *See* Doc. No. 40-2 at 93. For simplicity, I will refer exclusively to Kenneth when discussing the various ownership interests controlling the defendant businesses.



Paskert v. Auto$mart, Inc.

Doc. No. 40-2 at 92.  If lines were added to indicate employees who draw their pay from more than one of these entities, those lines would become quite tangled.  Nevertheless, each of the entities is separately registered and they reportedly pay each other for various services.[3]  Kenneth is on the board of directors of each entity but does not handle the day-to-day affairs of the businesses.  *Id*.  Kenneth estimates that he was at the Auto$mart,

---

[3] Despite Kenneth's descriptions of separate entities that reimburse each other, the employees at each business seemed to believe that the business entities were all part of the same umbrella. For example, Burns testified:

Q:     Does Auto$mart have an HR director that you would report to?

A:     Ms. Hoover was the HR director for the entire Kemna organization.

Q:     Okay.  So I understand this, Kemna has an umbrella organization.  Is that your understanding?

A:     Yes.  Owns new car dealerships, owns other entities.

Doc. No. 39-3 at 25.  A more detailed breakdown of the connections and receipts between the businesses was not provided in connection with these motions for summary judgment.

Inc., store in Spirit Lake for less than two hours in all of 2015. *Id.* at 40. Kenneth retains the authority to fire employees at each of his businesses. *Id.* at 39.

Defendant Brent Weringa is an Iowa resident. *Id.* at 73. In 2015, he was employed as a manager by Kemna Motor d/b/a Auto$mart of Algona and was also a consultant for the Auto$mart, Inc., through KMC finance. *Id.* at 75. Kenneth described this arrangement as follows:

> A: Brent Weringa's payroll records were for Kemna Motor Company d/b/a Auto$mart of Algona of which 80 percent approximately of his compensation was remunerated back from Kemna Holdings. Kemna Holdings was paid by a company called KMC Finance which is our finance arm that buys paper – finance contracts from the Auto$marts.
>
> So Brent Weringa's role was to protect KMC Finance's obligations and work as a consultant with the Auto$marts through KMC Finance to make sure those payments were properly made by all of its debtors.
>
> Q: So Brent Weringa in 2015 was employed by Kemna Motor Company?
>
> A: Brent Weringa had 20 percent employment with Kemna Motor Company d/b/a Auto$mart. 80 percent of his [pay] was subcontracted back out to Auto$marts and KMC Finance through Kemna Holdings . . . as a consultant.

Doc. No. 40-2 at 38. Weringa testified that he did not have supervisory authority over the employees of Auto$mart, Inc., although he was involved in overseeing the company. *Id.* at 38-39. Weringa was present for Paskert's interview. Doc. No. 40-2 at 51. Weringa explained that Auto$mart, Inc., would include him on hiring because selling at Auto$mart, Inc., was closely related to collections, which he oversaw. *Id.* at 75-76.

Defendant Brent Burns was the manager of the Auto$mart, Inc., dealership in Spirit Lake. Doc. No. 40-2 at 20. Burns accepted this position in January 2015. Doc. No. 39-3 at 21. Burns had the authority to hire and fire employees, including Paskert. Doc. No. 40-2 at 39. Burns testified that he considered Weringa to be his supervisor and

that Weringa had final authority over decisions such as hiring and firing. Doc. No. 39-3 at 23-24.

Defendant Kemna Motor is a General Motors dealership in Algona, Iowa, and also owns an Auto$mart dealership in Algona. *Id.* at 91. Kemna Motor typically has 30 employees.

KMC Finance, LLC, is a Florida limited liability corporation that acquires the consumer finance contracts entered into by Auto$mart branded dealerships. Doc. No. 40-2 at 94. Kemna Holdings, Inc.,[4] contracted with Auto$mart, Inc., Kemna Motor and other entities to provide services such as accounting, payroll, employee benefits, human resources, insurance, information technology, leadership training and consulting. *Id.* at 92-93. Each entity pays Kemna Holdings for these services. *Id.* at 93. Kemna Holdings does not appear to have any employees. At times, employees from Kenneth's businesses would do work for Kemna Holdings, which would in turn be billed to the business that needed the work done. For example, Lynn Hoover, a Kemna Motor employee, did payroll and personnel assistance for Auto$mart, Inc., through this arrangement. *Id.* at 38. Hoover did not have hiring, firing or supervisory authority at Auto$mart, Inc. *Id.*

Although Paskert was ostensibly employed by Auto$mart, Inc., many of the employment forms she completed name other businesses within Kenneth's various enterprises. Her application for health insurance lists "Kemna Auto Center" in Algona as her employer. Doc. No. 56-3 at 36. Her direct deposit form has "Kemna Auto Center" in the heading and her form I-9 lists "Kemna Auto Center" as the "Employer's Business or Organization Name," again with an Algona, Iowa, address. *Id.* at 40-42. Paskert signed an information security program agreement to comply with the policies and procedures outlined in "Kemna GM Center's Information Security Program." *Id.* at 45. "Kemna Motor Co" took out a driver's insurance policy for Paskert. *Id.* at 47. Paskert enrolled in a MetLife insurance program through her employer "Kemna" located

---

[4] Neither KMC Finance nor Kemna Holdings is a defendant in this case. *See* Doc. No. 31.

in Algona, Iowa. *Id.* at 50. Paskert's October 31, 2015, paycheck was drawn from an account titled "Kemna Express Lube" in Fort Dodge, Iowa. Doc. No. 56-2 at 4. The forms terminating Paskert's insurance and employment also contain "Kemna GM Center," "Kemna Auto," and "Kemna Auto Center" in the headings. *Id.* at 5-7, 50. Paskert's time clock summary report for the first week in November (before she was discharged) contains "Kemna Auto" in the header, as does the time report for the entirety of her time at Auto$mart, Inc. *Id.* at 8-13.

Kenneth explained this paperwork discrepancy as Kemna Holdings "subletting" work to Kemna Motor:

> Q:    Okay. So if we have seen records that refer to Kemna Motor Company . . . in Ms. Paskert's file . . . . Why would Kemna Motor Company be involved in her personnel file as opposed to Kemna Holdings?
>
> A:    That's a great question. As I stated earlier, we had just a few days to switch over from Kemna-Asa Auto Plaza to Auto$mart, Inc. Kemna Holdings was subletting work to employees of Kemna Motor Company. I had employees in Kemna Motor Company that had the experience and the time, and Kemna Holdings paid Kemna Motor Company on a sublet basis to have some of their employees provide services for Kemna Holdings which in turn provided the services to Auto$mart, as well as other entities that we do business with.

Doc. No. 40-2 at 38.

## B.    *Paskert's Employment*

### 1.    *Hiring and Training*

Burns hired Paskert as a sales associate in May 2015. Her job duties included car sales, collections, repossessions and preparing cars for sale. Paskert testified that Weringa and James Bjorkland – an experienced co-worker who shared the same job duties – trained her in sales. *Id.* at 53. Sales training took the form of role-playing exercises. Either Paskert or Bjorkland would play the role of a customer and they would go through

the "sticker pitch" on a specific car. *Id.* at 53. Other than these role-playing exercises, Paskert testified that she did not receive any other training in sales. Paskert states specifically that she never received a sales training manual. Doc. No. 56 at 165. Burns trained Paskert in collections. Doc. No. 40-2 at 53. For the first two to three months of her job, before she was sufficiently trained in any category, Paskert primarily worked on cleaning and preparing cars for sale. Doc. No. 39-3 at 7.

Despite "not having any supervisory duties," Weringa completed a 90-day performance review of Paskert's work on September 30, 2015. Doc. No. 56-2 at 3. Weringa scored Paskert as "satisfactory" in job performance, job knowledge and attendance, and commented that she should continue her training. *Id.*

At some point, Paskert's focus shifted to collections and secretarial duties, rather than sales. Bjorkland described the transition as follows:

Q:    Now, you've made the statement that Jennifer handled the collections. What do you mean by that?

A:    It started out as me training her, which I never really ever got the opportunity to do. She was improperly trained because it started out, you know, she learned the passwords and the procedures, which is a big part of it. The handbook obviously was another part of it. The motto that they have there that I still have burnt into my mind, which I'm not going to repeat now, and it was supposed to be – Beings I had experience with selling the vehicles, you want somebody that has the time. Brent didn't have the time. There might have been a couple times he had her in his office with the collections end of it, which I didn't do a lot of the collections. I collected payments, but as far as the calling people up – We ended up having a meeting after three months that I was going to be focusing on the sales end of it. Jennifer was going to be the collections. It wasn't a manger's title or anything, but she was doing such a wonderful job. Collections were at a minimum. I mean, she was doing very good at what she was doing, and then [Burns] was going to do his duties, so . . .

Doc. No. 40-2 at 9. While Paskert had success with collections, Weringa wanted her to be more involved with sales and requested that she spend more time shadowing

Bjorkland. *Id.* Bjorkland states that Burns prevented that from happening. *Id.* ("Q: Why was it that she didn't get the opportunity to shadow you? A. Because she got called back in because she was supposed to be the secretary and answer the phone. Q: Called back in by who? A: Brent Burns."), *see also id.* at 54 (Paskert's testimony that "if the phone range, I had to go back and answer the phone . . . [Burns] said that he was busy doing other things, that he was not going to be available to do that.").

Bjorkland further testified that there was not much need for a second salesperson at Auto$mart, Inc., Spirit Lake location: "Very rarely did you ever have more than one person on the lot. I mean, it's a little dealership, so I took the [customer] every time." *Id.* at 10. Indeed, it appears that Auto$mart, Inc., sold an average of 15 cars per month from June 2015 to October 2015. Paskert testified that she did not have the opportunity to conduct any sales due to the lack of training: "I was out on the lot, but I was instructed [by Weringa] to just carry on a conversation with them and answer any questions about the car until either James or [Burns] was available to speak with them. And then at that point I would be able to sit in on it . . . until I was properly trained." Doc. No. 40-2 at 54. Paskert further testified that Burns instructed her to defer sales to Bjorkland and Burns because they had more experience. *Id.* at 56.

Burns disputes that Paskert was attempting to finish her training to be a salesperson. Doc. No. 39-3 at 28. He testified that she "refused to go through the formalized training and refused to take sales training input from me." *Id.* This behavior began "[a]lmost immediately upon hire." *Id.* Burns agreed that he directed her to allow Bjorkland and himself to handle sales in the first instance. *Id.* at 32. Kenneth, who was in the dealership less than two hours for the entire year of 2015, testified that he believed Paskert had the exact same training as Bjorkland and that she just was not performing. *Id.* at 38.

## 2. Workplace Conduct

Viewing the evidence in the light most favorable to Paskert, as I must, the record reflects that Burns was an abusive manager.[5]  Dan Cline, a former employee of Auto$mart, Inc., left because of Burns' behavior.  Doc. No. 40-2 at 11-12.  Bjorkland testified that Burns was abusive to all his employees but observed that Burns' treatment of Cline and himself was different from his mistreatment of Paskert.  For example, although Cline was also unable to complete the required sales training due to the low volume of sales, Bjorkland testified that Burns did not interrupt Cline's training to make Cline perform secretarial duties, as he did to Paskert.  Doc. No. 56-3 at 32.

Burns frequently ridiculed and screamed at Bjorkland, who quit shortly after Paskert was discharged because he thought Paskert had been mistreated.  Doc. No. 40-2 at 11-12.  Bjorkland testified that he heard Burns refer to female customers as "bitches" and "cunts" upwards of 20 times but never heard Burns refer to a male customer by a degrading or offensive name.  *Id.* at 12.  Burns threw things.  Bjorkland heard Burns remark that he "should have never hired a woman," at times attributing the joke to his wife.  *Id.* at 8.  Burns frequently stated that he "wondered if I can make [Paskert] cry today," and thought it was funny to make Paskert cry.  *Id.* at 18.  Burns did not attempt to make male employees cry.

Burns discussed his sexual conquests frequently at work.  *Id.* at 14.  On one occasion, Bjorkland witnessed Burns attempt to rub Paskert's shoulders and say he was going to give her a hug.  *Id.* at 14.  Bjorkland believed this contact was unwelcome, as Paskert stated "I don't even know how your wife can put up with you.  I don't know how

---

[5] Abusive supervision and its effects have been extensively studied by social scientists and business experts alike.  *See* Bennett J. Tepper, *Abusive Supervision in Work Organizations: Review, Synthesis, and Research Agenda*, 33 Journal of Management 261 (June 2007).  Generally, abusive supervision is defined to include supervision which uses loss of temper, hostility, belittling, and threatened or actual violence as management strategies, typically motivated by a combination of power differentials (between supervisors and subordinates) and workplace stressors (i.e., deadlines or sales quotas).

she can tolerate the way you are to women." *Id.* Burns replied, "Oh, if you weren't married and I wasn't married, I could have you . . . You'd be mine . . . I'm a closer." *Id.* Burns repeated this remark a second time. *Id.*

Paskert testified as to Burns' behavior towards her and other females:

A:    . . . Burns had no problem walking around the office, yelling at James and I, throwing things in the shop. He would call us stupid. He would hang up the phone with delinquent accounts, calling them bitches and cunts. He would – almost got into a fistfight altercation with a customer that was in there.

He got into it with me and I – his theory was, ["M]y wife told me I should have never hired a girl.["] His goal that he repeatedly told James and myself was to see how many times in a day he could make me cry.

The one time that we fought, he sent us out a text message telling us sorry for his behavior for the day and that he was hoping for a better day the next day, and that it was going to be a jeans day.

The door between my office and his office was never eligible to be closed so I never had an office to myself. It had to remain open unless he had somebody in his office.[6]

The time that he and I did fight and there was a window between James and I's office, James could see that I was crying and [Burns] came in and apologized, rubbing my shoulders and forcing me to give him a hug to accept his apology.

Q:    What else?

A:    James got up and walked out. And he and [Burns] had gotten into a fight. . . . James walked out, and I called James to come back

---

[6] Paskert elaborated later that Burns would interrupt her collections calls with clients by yelling through the door about what she should or should not say. Doc. No. 40-2 at 64. She stated that this was not an effective training technique because Burns could not hear what the caller was saying. *Id.* Paskert testified that Bjorkland was not required to keep his door open. *Id.* Further, on those occasions when Burns made Paskert cry, Paskert would frequently close the door for privacy only to have Burns reopen it. *Id.* at 65.

> because I didn't want to be left there alone with him. And James
> came back and [Burns] said that it was my fault that James had left.

Doc. No. 40-2 at 58-59, *see also id.* at 62. Although Paskert admitted that Burns frequently lost his temper with everyone – including male employees and various non-employees – she believed he more frequently lost his temper and was abusive to her because she "wasn't an asset to the company to him." *Id.* at 60.

Both Paskert and Bjorkland testified that they reported Burns to management. Bjorkland reported Burns' brags about his sexual conquests to Weringa. Doc. No. 40-2 at 17. Paskert called Weringa in September 2015 and reported that there were difficulties. *Id.* at 58. Paskert states that she told Weringa about Burns' statements that he never should have hired a woman and that his goal was to make her cry, although she did not testify as to the date she made this complaint. *Id.* at 63. Paskert reported the shoulder-rubbing incident to Weringa. *Id.* at 65. In October 2015, Ryan Schmidt[7] was added to the management structure of Auto$mart, Inc.[8] *Id.* at 60. Schmidt observed Burns' abusive behavior, telling Paskert and Bjorkland that "he wasn't going to be able to tolerate that" behavior and that "he was going to take it up to the next level." *Id.* at 61.

Weringa does not recall receiving any complaints from Bjorkland, Paskert or Schmidt regarding Burns. Doc. No. 39-3 at 43. He testified that if there had been a mention of harassment or any type of abuse, he would have reported it to Kenneth that day. *Id.* Kenneth states that he was unaware of any complaints Paskert had about a hostile work environment or sexual harassment. Doc. No. 40-2 at 40. After Paskert was discharged, Kenneth remembers talking to Bjorkland about Burns' behavior. Doc. No.

---

[7] If Schmidt was deposed, his deposition was not provided along with the parties' motions for summary judgment. It is unclear whether Schmidt would testify to remembering these events.

[8] Schmidt was hired to take over the management of Auto$mart, Inc. Doc. No. 56-3 at 18. Burns would eventually shift to another of Kenneth's ventures, Okoboji Indian (a company selling motorcycles) as a part shareholder. However, Burns' stock in Okoboji Indian never matured and the partnership agreement was terminated in July 2016. *Id.*

56-3 at 11.  According to Kenneth, Bjorkland described Burns as treating Bjorkland and Paskert equally bad.  *Id.*

Burns does not recall any issues in his relationship with Paskert.  Doc. No. 39-3 at 30 ("Q: You didn't sense that there was a personal issue going on between you and her?  A: Did not.").  Burns further does not recall Weringa ever bringing complaints to him about his behavior towards Paskert or any other employees, nor does he recall having a conversation with Bjorkland about how he was treating Paskert.  *Id.* at 30-33.  Burns recalls a time when he sent a text message apology to Bjorkland and Paskert stating that they could wear jeans the next day but does not believe that incident was connected to his behavior.  *Id.* ("A: She testified about a particular day where I sent a text . . . It was a high stress day.  Lots of collection problems . . . Q: You say it was a high stress day.  Was that affecting your ability to interact with your salespeople?  A: No.").

Burns believes that if Paskert complained about his behavior to Weringa, he would have heard about it, because "[Weringa] and [Burns] had a very open and positive relationship and spoke nearly every day."  *Id.* at 32.  Burns recalls using the words "bitch" and "cunt" in the office, but states that Paskert laughed when he did so.  *Id.* at 34.  Burns recalls Paskert telling two stories that involved sex.  *Id.* at 34.  Burns admits that Paskert cried frequently at work; however, he stated that she "chose to cry as a way to get out of receiving coaching, mentoring and counseling," and states that it was never his intent to make her cry.  Doc. No. 61 at 12.  Finally, Burns denies Paskert's claim that he put his hands on her shoulders and asked for a hug.  *Id.* at 11.

### 3.    Demotion and Termination

As part of the sales team, Paskert was paid a base rate of $750 per month plus a per-unit commission of $100 per car sold, a $200 "spiff"[9] payment each month, and a

---

[9] "Spiff" is a slang term for a sum paid to a salesperson to motivate them to sell a vendor's goods or products, outside of or above a standard commission.  *See* Jan Triplett, Business Insider Center, *Generating Sales through a SPIFF Program* (July 19, 2013),

$400 "collection bonus" if Auto$mart, Inc.'s collection revenue was more than 95% of expected payments. Doc. No. 39-3 at 53-62. Paskert was guaranteed a minimum salary of $1,200 per pay period. During the five months that Paskert was employed at Auto$mart, Inc., she was paid a gross amount of $15,605, or just over $3,000 a month. *Id.*

In November 2015, Burns and Kenneth offered Paskert a new payment plan and job title of collections management/sales support. Paskert argues that this was a demotion. Kenneth described the decision to change Paskert's job and pay as follows:

> A:    On or about September – and it's in the records when she was presented her new pay plan, so those are on about the dates – I met for year end reviews with Mr. Burns in my home office in Spirit Lake, Iowa, to go over the past year and go over what the plans were for the next year.
>
> My evaluation of our sales and the numbers and who was producing the sales was James Bjorkland was producing almost exclusively all the sales from the time he was there up through September with Jennifer Paskert being responsible for very, very few, if any.
>
> ***
>
> Q:    What did you tell Mr. Burns?
>
> A:    I said, Mr. Burns, Jennifer Paskert is not performing at the level she needs to and it's not fair to Mr. Bjorkland. He's doing all of the selling and he's being compensated the same as someone that's doing basically none of the sell and they're paid off the same pay plan. That's not fair to Mr. Bjorkland. We need to review Mr. Bjorkland's pay because he should be compensated more for the efforts and the work and the success he's doing and – as a team pay plan and she's not contributing and he's contributing it all. That doesn't work in our merit pay system. So she needs to be terminated.
>
> Q:    Then what happened?

www.ownersview.com/spiffs-good-incentive-for-salespeople/. It is not clear how the spiffs paid to Bjorkland and Paskert as part of their compensation were calculated.

A:    Mr. Burns defend her to the endth degree.  She's a good person.  I keep working with her.  I can help her.  Which is what he had told me for the months leading up to that as well.  She's a good person.  She helps us in other ways.

So he proposed that we make her a collections agent because her skill set was better set for that.  She got along with those people, and if we made her a collections agent, that she possibly could contribute at a level that made sense.

I said, well, collection agents and paperwork people don't have the same pay plan and have value to the company as sales agents do.  They have different – they have different – they bring different value to the company.  So we need to put a pay plan together that makes sense and that reward her for doing what she does for her position.

Doc. No. 40-2 at 40.

Under the new payment plan, Paskert would continue to receive a base rate of $750 per month, plus a per-unit commission of $25 per car sold and a $1,000 collection bonus if the collections revenue for the previous 10 weeks averaged greater than 95% of the expected payments.  Doc. No. 39-3 at 70.  It is not clear whether the $200 spiff paid to sales associates would be paid under the new plan, but I will include it in my calculation below.  The chart below compares Paskert's actual compensation over her five months of employment to the estimated compensation she would have received during those same months had the new compensation plan been in effect:

| Month | Units Sold | Collections Percentage | Sales Associate Compensation: | Estimated Collections Compensation: |
|---|---|---|---|---|
| June 2015 | 22 | 98.25% | $3,350 | $2,500 |
| July 2015 | 26 | 97.8% | $3,550 | $2,600 |
| August 2015 | 13 | 97% | $2,650 | $2,275 |
| September 2015 | 11 | 97.5% | $2,450 | $2,225 |
| October 2015 | 16 | 96.3% | $3,025[10] | $2,425 |

[10] It appears that a second $75 spiff was paid in the month of October 2015.  I will assume that a collections employee would have also received this spiff.

16

Thus, instead of being paid $15,025, Paskert's estimated compensation would have been just $12,025, a pay decrease of $600 per month.

Paskert believed she did not have a choice but to accept the lower compensation, because the alternative was termination. Doc. No. 56-1 at 4. She testified that she believed she had been held back in her training and subsequently demoted because she was a woman. *Id.* Paskert signed the new compensation plan on November 3, 2015, but informed Burns that she needed to talk to her husband about it. *Id.* at 5. Paskert was discharged three days later, on November 6, 2015.

Burns stated that he terminated Paskert's employment for insubordination because of "her refusal to discuss what was bothering her on Friday, November 6th." Doc. No. 40-2 at 32. Specifically, Burns stated that she was insubordinate "[b]y not agreeing to come with [him] to [his] office to discuss her. . . situation in a professional manner. *Id.* Burns explained that Paskert was sitting at the "payment counter" when Burns asked her to go to his office and talk, but she refused to do so. Doc. No. 39-3 at 30. Burns wrote a memorandum contemporaneous with the discharge on November 7, 2015, in which he criticized Paskert's sales records and use of profanity at work. *Id.* at 52. Burns also wrote that after being notified of her discharge on November 7, Paskert "left the dealership with her passwords and log-ins, threw candy all over the payment desk and threatened that she would be speaking with her lawyer on her way out." *Id.* at 52. An undated addendum to the memo by Weringa states that Paskert had resisted sales training. *Id.* at 53. Kenneth testified that he was shocked upon learning that Burns fired Paskert for insubordination, as Burns had defended her previously. Doc. No. 56-3 at 10-11.

Paskert disagrees with this characterization of the events. She testified that on November 6, "[Burns] did ask me [what was wrong], yes. I did tell him what it was. And he turned around and told me that since I seemed upset about it, that I needed to go home for the day and to come – and to come back the next day after – after a fresh start." Doc. No. 40-2 at 70. On November 7, 2015, Paskert returned to work and was called

into Burns' office. She testified that she wanted to have someone else in the room as a witness but was not allowed to do so. Paskert denies that she left with her passwords or logins, or that she threw anything as she was leaving. Doc. No. 56-1 at 5-6. Paskert also denies that she ever used profanity at work, or that she was reprimanded for doing so. *Id.*

## V.    ANALYSIS

As noted above, Paskert asserts claims under federal and Iowa law that she was subjected to sex discrimination in the form of a hostile work environment, and that she was fired in retaliation for reporting the alleged sex discrimination. Iowa courts apply the same analysis to claims brought under the Iowa Civil Rights Act (ICRA) that federal courts apply to claims brought under Title VII of the Civil Rights Act of 1964, as amended. *See Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1046 (8th Cir. 2003) (considering hostile work environment claims under the ICRA and Title VII together); *Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 748 (Iowa 2006) (analyzing an ICRA hostile work environment claim under the same framework applied in Title VII cases). Thus, I will consider Paskert's state claims together with their federal counterparts.

### A.    Bars to Liability

#### 1.    Employers

Auto$mart, Inc., and Kemna Motor argue that neither Title VII nor the ICRA apply to them. Auto$mart, Inc., contends that it was not an employer as defined by either Title VII or the ICRA because it did not have the requisite number of employees. Kemna Motor argues that Paskert was not its employee. Paskert responds that Auto$mart, Inc., and Kemna Motor are an integrated enterprise such that Title VII and the ICRA apply to both.

Title VII applies to employers who are "engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or

more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b). The ICRA does not apply to "any employer who regularly employs less than four individuals." Iowa Code § 216.6(6)(a). However, there are circumstances in which employees of separate entities may be combined for purposes of meeting the numerosity requirement. *See Sandoval v. Am. Bldg. Maint. Indus. Inc.,* 578 F.3d 787, 792-93 (8th Cir. 2009) ("Title VII . . . is to be accorded a liberal construction. In particular, such liberal construction is also to be given to the definition of employer." (cleaned up)); *Dalton v. Manor Care*, 986 F. Supp. 2d 1044, 1057-58 (S.D. Iowa 2013) (Plaintiff created a genuine issue of fact as to whether defendants were "employers" under Title VII and the ICRA under integrated enterprise theory). Courts look to the following factors to determine whether multiple, distinct entities should be treated as an integrated or joint enterprise for civil rights actions: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership of financial control. *Sandoval*, 578 F.3d at 793. Thus, "separate entities that form an integrated enterprise are treated as a single employer for purposes of both coverage and liability, and relief can be obtained from any of the entities that form part of the integrated enterprise." *Id.* (citation omitted).

Kenneth argues that there is no interrelationship between his various enterprises, and that each of the factors in the *Sandoval* analysis weigh against a finding that the Kemna enterprises should be counted as an integrated enterprise. However, construing the facts in Paskert's favor, a reasonable jury could find that the Kemna businesses are an integrated enterprise. Control of labor relations is centralized: Kemna Motor employees provide human resources services for Auto$mart, Inc.[11] Further, there is

---

[11] Although Auto$mart, Inc., allegedly paid for these services through Kemna Holdings, there is no record of payment in evidence, and that payment would not be dispositive in any event. See *Sandoval*, 578 F.3d at 797-98 (analyzing agreement between companies to provide accounting, administrative and electronic services, employee benefits, human resources, insurance, legal services, safety advice and treasury services).

documentary evidence to suggest that the Kemna enterprises were interrelated on matters of health and unemployment insurance, company policy and payroll.

Finally, the Kemna enterprises shared common management and ownership. Weringa was paid by both KMC Finance and Kemna Motor to provide services at all Auto$mart locations, including the Auto$mart, Inc., location in Spirit Lake, where he appears to have performed management duties. Kenneth was on the board of directors at each company and testified that he had hiring and firing authority at each company, although he typically left that task up to the managers. Kenneth is the undisputed sole owner of Auto$mart, Inc., Kemna Motor and each of the auxiliary companies through which the two interact. Reasonable jurors could find that the defendants are an integrated enterprise. Summary judgment is denied on this ground.

### 2.    *Individual Liability*

Weringa, Kemna and Burns cannot be held individually liable under Title VII. *Lenhardt v. Basic Inst. Of Tech., Inc.*, 55 F.3d 377, 381 (8th Cir. 1995) ("[S]upervisors and other employees cannot be held liable under Title VII in their individual capacities."). Weringa and Kemna further contend that although the ICRA provides for individual liability, neither Weringa nor Kemna are supervisors, therefore they cannot be held liable under the ICRA.

The ICRA permits a cause of action against an individual for discriminatory employment practices. *See Vivian v. Madison*, 601 N.W.2d 872, 873-75 (Iowa 1999). Although Weringa and Burns contend that Iowa Law limits individual liability to supervisors, nothing in *Vivian* or the ICRA so limits claims. *See Blazek v. U.S. Cell. Corp.*, 937 F. Supp. 2d 1003, 1023 (N.D. Iowa 2011) (Bennett, J.) ("If anything, the Iowa Supreme Court recognized in Vivian that the language of the ICRA would impose liability on any "person," not just an "employer" or a "supervisor."). The ICRA states that "[i]t shall be an unfair or discriminatory practice for any *[p]erson*" to "discriminate in employment against any" employee on the basis of sex. Iowa Code § 216.6(1)(a)

(emphasis added). Not all acts of discrimination listed in the ICRA require action of a supervisor – for example, pervasive sexual harassment creating a hostile work environment need not be committed by a supervisor to be actionable. Indeed, the ICRA creates individual liability for "aiding and abetting . . . in any of the practices declared unfair or discriminatory by this chapter." *Blazek*, 937 F. Supp. 2d at 1025 ("Iowa Code § 216.11 permits individual liability of co-workers for 'aiding and abetting' sexual harassment and other conduct prohibited by the ICRA.").

Finally, assuming for the sake of argument that individual liability under the ICRA is limited to "supervisory" employees, neither *Vivian* nor any other Iowa case has defined the term "supervisory." Like Title VII, the ICRA is to be "construed liberally to effect its purposes." Iowa Code § 216.18(1). In this case, there is some evidence that both Weringa and Kenneth had supervisory authority over the employees at Auto$mart, Inc. Kenneth referred to Weringa as a "district manager" and Weringa participated in training Paskert. Weringa stated that he participated in hiring decisions. Burns testified that he believed he answered to Weringa. Kenneth, Burns and Weringa agreed that if an employee had complaints about Burns management style, they could go to Weringa and Kenneth. Finally, Kenneth acknowledged that he has the final say in personnel decisions. Under these facts, a reasonable jury could find that Weringa and Kenneth are subject to liability under the ICRA liable as "supervisors."

### 3.    *Exhaustion*

Defendants argue that Paskert has failed to exhaust her retaliation claim because she did not include it in her charge with the Iowa Civil Rights Commission (ICRC) and the Equal Employment Opportunity Commission (EEOC). Paskert's complaint in this case states that the defendants retaliated against her "by disciplining, demoting, and terminating her from her employment because she exercised her right to protest the unlawful discrimination, harassment, and hostile work environment she experienced"

because she complained to fellow employees, Burns and Weringa, about the harassment, hostile work environment and failure to train her in her duties.  Doc. No. 31 at ¶ 40.

To pursue a lawsuit under Title VII or ICRA, a plaintiff must first exhaust his or her administrative remedies.  "Administrative remedies are exhausted by the timely filing of a charge and the receipt of a right-to-sue letter." *Faibish v. Univ. of Min..*, 304 F.3d 797, 803 (8th Cir. 2002); *see also Baker v. John Morrell & Co.*, 220 F. Supp. 2d 1000, 1009 (N.D. Iowa 2002).  The Eighth Circuit "deem[s] administrative remedies exhausted as to all incidents of discrimination that are like or reasonably related to the allegations of the charge." *Hargens v. USDA*, 865 F. Supp. 1314 (N.D. Iowa 1994) (quoting *Tart v. Hill Behan Lumber Co.*, 31 F.3d 668, 371 (8th Cir. 1994).  However, if a plaintiff charges only certain forms of discrimination without hinting at another claim, dismissal for failure to exhaust administrative remedies is proper.  *See Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 223 (8th Cir. 1994).

Paskert claims that she preserved her retaliation claim in her responses to certain questions on an ICRC questionnaire:

4.   What reason(s) were given for your termination?

I was told I was being fired for insubordination.

***

11.   If the Respondent has claimed that conduct is the reason for your termination, has anyone else done either what you are accused of doing, or something similar?  If your answer is "yes," give their name(s), position title(s), sex.

Yes James Bjorkland, Male, Salesperson

12.   Explain what this person(s) did.

James Bjorkland expressed his concerns as to how I was being treated and how Brent Burns was treating James himself and James was not demoted or penalized and was not let go from his position.  James quit two weeks after I was let go as things did not get any better as far as treatment of Brent Burns staff went.  James stood up

to Brent Burns when Brent found it necessary to bad mouth me and call me names after he fired me to James face. James told him that I was his friend and he was not going to listen to Brent bad mouth me if I was not there to defend myself.

13.    What if any discipline did this person receive?

None, James was still able to perform all of his job duties.

Doc. No. 56-3 at 55-56. According to Paskert, "It can be reasonably inferred from those questions and responses that retaliation is an issue because she was demoted and penalized for expressing her concerns." Doc. No. 55-2 at 11. Another ICRC form asked if Paskert had "previously complained to anyone within the organization . . . or reported discrimination or participated as a witness, do you believe you have suffered an adverse action or have been treated differently since you complained about discrimination?" and "If yes, how were you retaliated against and by whom?" Doc. No. 56-3 at 51. Paskert left the answer field to these questions blank.

I conclude that it cannot be "reasonably inferred" from Paskert's nonresponsive answers to the ICRC questionnaire that retaliation was at issue in this case. Title VII and the ICRA prohibit employers from retaliating against employees for opposing sexual discrimination. *Stoddard v. BE & K, Inc.*, 993F. Supp. 2d 991, 1002-03 (S.D. Iowa 2014). To establish a claim for retaliatory discrimination, a plaintiff must establish "(1) [she] engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal connection between participation in the protected activity and the adverse employment action." *Gagnon v. Sprint Corp.*, 284 F.3d 839, 850 (8th Cir.), cert. denied, 537 U.S. 1001 (2002). Activity protected by Title VII includes "opposing any practice made unlawful by Title VII" and "participating in an investigation under Title VII." 42 U.S.C. § 2000e-3(a). Paskert did not allege in her administrative complaint that she was terminated after she complained about sexual harassment or after participating in a sexual harassment investigation.

Although Title VII claims for discrimination and retaliation appear related, they are distinct. The Eighth Circuit has considered an identical exhaustion issue in the context of disability discrimination:

> Wallin next argues that his 1993 discharge was in retaliation for making internal discrimination complaints. However, Wallin failed to allege retaliation in his EEOC Charge of Discrimination. Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumscribe the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge. Although a plaintiff will be deemed to have exhausted administrative remedies as to allegations contained in a judicial complaint that are like or reasonably related to the substance of charges timely brought before the EEOC, it is well established that retaliation claims are not reasonably related to underlying discrimination claims. Thus, Wallin's retaliation claim will not be considered unless it grew out of the discrimination charge he filed with the EEOC.
>
> The retaliation Wallin alleges was not the result of his filing of the EEOC charge. Indeed, the retaliation alleged by Wallin occurred at the same time as the alleged discrimination, long before he filed a charge of discrimination with the EEOC. Because Wallin did not allege retaliation in his EEOC charge, we need not consider this claim.

*Wallin v. Minnesota Dept. of Corrections*, 153 F.3d 681, 688-89 (8th Cir. 1998) (cleaned up). Like Wallin, Paskert alleges retaliation that occurred at the same time as the alleged discrimination, before she filed a charge of discrimination with the ICRC. Like Wallin, Paskert was required to separately allege retaliation in her administrative complaint. Because she did not do so, she failed to exhaust that claim. I will grant summary judgment as to Paskert's claims of retaliation under Title VII and the ICRA.

## B.    Hostile Work Environment - Merits

Paskert's remaining claim is that she was discriminated against based on sex because she was subjected to a hostile work environment.[12]  The defendants argue that the harassment Paskert endured, if any, was not sufficiently pervasive or severe to state a prima facie case for sex discrimination.

Both Title VII and the ICRA prohibit an employer from discriminating against an employee with respect to her compensation, terms, or conditions of employment on the basis of sex.  Sexual discrimination or harassment that creates a hostile or abusive work environment violates Title VII and the ICRA.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986); *Stoddard*, 993 F. Supp. 2d at 999.

> [H]ostile work environment harassment raises when sexual conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.  To prevail on a sexual harassment claim, a plaintiff must show that "(1) she belongs to a protected group, (2) she was subject to unwelcome sexual harassment, (3) the harassment was based on sex, (4) the harassment affected a term, condition, or privilege of employment, and (5)

---

[12] I note that Paskert has not advanced a claim of discriminatory treatment, distinct from hostile work environment, based on sex.  While her complaint uses the term "discrimination based on sex," her allegations focus on a claim for hostile work environment.  *See* Doc. No. 31 at ¶¶ 27-31 (using buzzwords for discrimination, retaliation and hostile work environment, without actually making allegations in support of any particular theory, under the heading "Discrimination based on Sex.").  If Paskert intended to bring a separate claim that she suffered adverse employment action based on sex, the organization of her complaint did not aid her in this endeavor.  *See Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1045-48 (8th Cir. 2005) (comparing standards for proving discrimination by direct or indirect evidence, as well as standards for proving hostile work environment discrimination).  More importantly, in resisting the motions for summary judgment, Paskert did not assert that she relies on any legal theories other than retaliation and hostile work environment.  *See* Doc. Nos. 55-2 and 57-2 (briefing those claims but not asserting that Count I of the Second Amended Complaint also includes a claim for discriminatory treatment based on sex).  Thus, while the record includes evidence that might provide some support for such a claim, I conclude that it is not part of this case.  *See, e.g., Scott v. City of Sioux City, Iowa*, 68 F. Supp. 3d 1022, 1037-38 (N.D. Iowa 2014) (Bennett, J.) (noting that the record might support a claim for retaliatory hostile work environment but declining to address the claim's viability because plaintiff neither pleaded it nor advanced it in resisting the defendant's motion for summary judgment).

the employer knew or should have known of the harassment in question and failed to take proper remedial action.

*Hall v. Gus Const. Co.*, 842 F.2d 1010, 1013 (8th Cir. 1988). A "hostile work environment" occurs when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993) (citations omitted). By their nature, hostile work environment claims are not isolated incidents, but rather entail ongoing and repeated conduct. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).

Viewing the evidence most favorably to Paskert, the environment described by Paskert and Bjorkland was certainly hostile and a great deal of the incidents described by Paskert were motivated by her sex. Such behavior in the workplace is obviously harmful, and well beyond the bounds of "civility." As the Chief Justice of the Iowa Supreme Court recently explained:

> The effects of hostile-work-environment are known and severe. Women who are sexually harassed "feel humiliated, degraded, ashamed, embarrassed, and cheap, as well as angry." Catharine A. MacKinnon, Sexual Harassment of Working Women 47 (1979) [hereinafter MacKinnon." Women do not "want to be sexually harassed at work. Nor do they, as a rule, find it flattering." *Id.* "Women's confidence in their job performance is often totally shattered," and "[t]hey are left wondering if the praise they received prior to the sexual incident was conditioned by the man's perception of the sexual potential in the relationship." *Id.* at 51. Importantly, "Title VII comes into play before the harassing conduct leads to a nervous breakdown." [*Harris*, 510 U.S. 17]. Harassment need not "seriously affect employees' psychological well-being" in order to "detract from employees job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Id.* at 22.

*State v. Watkins*, 914 N.W.2d 827, 855 (Cady, J., dissenting). However, I must consider whether, within the context of Eighth Circuit case law, this behavior rises to the level of "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21.

The Eighth Circuit has long and consistently held that conduct well beyond the bounds of respectful, appropriate and adult behavior is not sufficient to create a hostile work environment:

Four decisions help to illustrate the boundaries of a hostile work environment claim under circuit precedent. In *Duncan v. General Motors Corp.*, 300 F.3d 928 (8th Cir. 2002), the court determined that a plaintiff had not proved a hostile work environment with evidence that a supervisor sexually propositioned her, repeatedly touched her hand, requested that she draw an image of a phallic object to demonstrate her qualification for a position, displayed a poster portraying the plaintiff as "the president and CEO of the Man Hater's Club of America," and asked her to type a copy of a "He-Men Women Hater's Club" manifesto. *Id.* at 931-35. In *Anderson v. Family Dollar Stores of Ark., Inc.*, 579 F.3d 858 (8th Cir. 2009), where a supervisor had rubbed an employee's back and shoulders, called her "baby doll," "accus[ed] her of not wanting to be 'one of [his] girls,'" suggested once in a long-distance phone call "that she should be in bed with him," and "insinuate[ed] that she could go farther in the company if she got along with him," this court ruled that the evidence was insufficient to establish a hostile work environment. *Id.* at 862. And in *LeGrand v. Area Resources for Community and Human Services*, 394 F.3d 1098 (8th Cir. 2005), the court ruled that a plaintiff who asserted that a harasser asked him to watch pornographic movies and to masturbate together, suggested that the plaintiff would advance professionally if the plaintiff caused the harasser to orgasm, kissed the plaintiff on the mouth, "grabbed" the plaintiff's buttocks, "brush[ed]" the plaintiff's groin, "reached for" the plaintiff's genitals, and "briefly gripped" the plaintiff's thigh, had not established actionable harassment. *Id.* at 1100-03. Even *Rorie v. United Parcel Service, Inc.*, 151 F.3d 757 (8th Cir. 1998), which this court described as a "borderline" case for submission to a jury, *Id.* at 762, involved harassment of greater frequency and duration that the three incidents alleged by McMiller. The plaintiff in *Rorie* testified that her supervisor asked her about a coworker's penis size, told her that she looked better than other women in her uniform, and "throughout" three years of employment "often" told her that she smelled good, patted her on the back, and brushed up against her. *Id.* at 761.

In light of these precedents, Brown's alleged conduct was not so severe or pervasive as to alter the terms and conditions of McMiller's employment. We therefore affirm the district court's grant of summary judgment on this claim.

*McMiller v. Metro*, 738 F.3d 185, 188-89 (8th Cir. 2013).  The Iowa Supreme Court has generally turned to federal law, including decisions of the Eighth Circuit Court of Appeals, when considering hostile work environment claims under the ICRA.  *See, e.g., Watkins*, 914 N.W.2d at 843-44 (citing decisions of the United States Supreme Court and the Eighth Circuit in describing the showing necessary to establish a hostile environment claim); *Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 743-44 (Iowa 2003) (same).

Under the legal standards by which I am bound, Paskert's allegations do not come close to establishing that Burns' conduct was so severe or pervasive as to alter the terms and conditions of her employment.  Over a period of employment that lasted five months, Paskert alleges one instance of unwelcome physical conduct, one or two statements that Burns could "have Paskert" if they were not married to others, and several statements that he should never have hired a female.  Burns also repeatedly attempted to make Paskert cry and referred to female customers as "bitches" and "cunts."  Assuming such behavior occurred, it was obnoxious and disgusting.  Any alleged "adult" who behaves this way in the workplace is a creep who should be embarrassed, condemned and shunned.  The same is true of any employer that tolerates such behavior.  Nonetheless, the issue here is whether the alleged conduct meets the "severe and pervasive" standard applied by the Eighth Circuit Court of Appeals and the Iowa Supreme Court.  It does not.  As such, defendants' motions for summary judgment must be granted as to Paskert's claims of discrimination based on a hostile work environment under Title VII and the ICRA.

## VI.    CONCLUSION

For the foregoing reasons, defendants' motions (Doc. Nos. 39, 40) for summary judgment are **granted** as to all claims.  As a result:

1.      Judgment will enter in favor of the defendants and against the plaintiff.

2.     The trial of this action, currently scheduled to begin February 11, 2019, is hereby **canceled**.

3.     The Clerk shall **close this case**.

**IT IS SO ORDERED.**

**DATED** this 7th day of November, 2018.

_____
Leonard T. Strand, Chief Judge